I move the admission of Jonathan L. McFarlane, who is a member of the Bar in Good Standing of the Highest Court of California. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications and I'd just like to say personally what an honor and a pleasure it's been to have Jonathan and his family become part of our little world here at the court over the past year and to share their joys, most notably Jonah's getting his little sister, Jackie, seven months ago, who's joined us today too. We're very proud of her. Jonathan's been a tremendous clerk and the court and I in particular have benefited from his insight, his intellect, and his professionalism and so as he joins up our today and as I send him back out to the real world, short order, it's with a tremendous amount of gratitude and admiration and fondness that I do so. Your motion is granted. If you would step over to the clerk, he will administer the oath of office. I do. Congratulations and welcome to the Bar of the United States Court of Appeals. Very well and now we have three cases on 1583 Frisket against real networks. Before we begin, in this case we have briefs that are marked in all instances confidential and considerable portions, actually if both counsel could rise we can address this question among all of us. Considerable portions of the material in the brief are marked confidential. Frankly it struck each of us that there wasn't anything that was what is normally important protected material in cases that come before us and I just want to inquire of the two of you if we are free both in the course of this argument and also in any opinion that might issue in this case to discuss any of the materials in the brief or is there any particular portion of the materials in the brief that you would like us to respect as confidential and if so, which? The appellant, your honor, would have no objection to the court using any of the material in the brief or in the appendix. Very good. May I have just one moment to check with my colleagues? Certainly. We don't have anything either that comes to mind, your honor. Certainly not for argument. Our client may, one thing that I might suggest is for us to quickly check with our client and send a letter to the panel. All right, well that's fine and we will then, for purpose of argument, we'll just go ahead and move on to the next item, which is confidentiality. I would like to ask you, your honor, regarding this is open for free discussion, but when you discuss this with your client I would hope that you would emphasize the need to be extremely sparing in any assertions of confidentiality in which there has to be some real need. Frequently we see claims of confidentiality, probably because of some protective order that was entered at the beginning of the case, that go way beyond anything that could conceivably be of practical interest to the parties to keep confidential. Any further assertion of confidentiality, we would hope, would be limited to those matters that are really critical, if any. Understood, your honor. Okay, very well. We'll proceed then on that basis. Then, Mr. Nagy? Nagy, thank you, your honor. Nagy, thank you. May it please the court, good afternoon. This court should reverse and remand the district court's summary judgment grant of obviousness. The district court could not have properly held that real met its burden by clear and convincing evidence on a record replete with factual issues. First of all, your honor, the district court did not identify a single combination of the prior art that it held rendered the claims invalid. It used one combination, the Winamp media player, along with media provided by MP3.com and iUma.com, to find certain elements of the claims in the prior art, and used another combination, the real player plug-in, used in conjunction with the iUma radio feature, to find the critical claim element of programmatic control in the prior art. On this critical claim element of programmatic control, the district court did not even have the allegedly invalidating reference before it. The code for the iUma radio reference, which is the code on which the court said provided the JavaScript from the network server to the client, that code was not produced in this litigation. It is not in the appendix. Well, let me ask you about the term programmatic control. In your view, does it preclude the interaction of the operating system with the commands that are going from the server to the media player? Your honor, it is our view that programmatic control renders that operating system role irrelevant, because the control is directly from the network server module to the media playback component. Does that mean the answer to my question is a yes? Yes. So your position is that that control must be exclusively provided from the network server? In the case of the 467 patent, which recites the network server module programmatically controlling the media playback component, that is correct. And what's the best intrinsic evidence you can point to to support that conclusion? Figure 5 in the accompanying specification, figure 5, which describes the results of a user's search request is signaled from the network server module through URLs and commands directed to the application program interface of the media playback component. Separately, the network server component signals visual elements for display to the user to the browser component. In the prior art, contrast this with the prior art, your honor, search results are returned to the user in a web page, not sent directly to the media player. The user must then manually click on a link, the media file is downloaded, and then passed to a media player as determined by the operating system's file type associations. In the Frisket system and the Frisket patents, the system does not depend on the user clicking on a link to the displayed search results in a web page in the browser, having the file downloaded and then passed to the media players in that file type association. There is, at best, a factual dispute that this programmatic control did not exist in the prior art, created by the statements and admissions of Reel's own expert Dr. The language of the claims themselves, the specification at column 21, lines 3 through 16, and really 3 through 34, the specification also at column 21 is the description of figure 5. Correct. Which is what, okay. Yes. Also then, the 467 patent at column 3, lines 10 through 28, and- And what are they, can you summarize just what all of these references that you're giving me in the specs say? That the network server module signals to the media playback component, the URLs of the media resources, as well as the commands to cause the playback of those resources, to automatically load those resources into the media player. In the district court's opinion, there's a statement that the ReelPlayer 4.0 plug-in software came bundled with Internet Explorer 4.0 and could be controlled from web pages through Java and other technologies, referencing Smith Declaration Exhibit 5. Is that declaration contained in the appendix? It is, Your Honor. It is the Smith Declaration to Reel Network's reply brief, and the particular page number of Mr. Smith's declaration is at A5447 through A5448. Mr. Smith, Dr. Smith relies upon the declaration of a Mr. Patterson, which is at 4392 to 4393. Can I ask you about the Smith Declaration then, because I think in your brief, one of the arguments that is made, at least, is that the district court had a misstatement in its view, and I think it was in quoting the Smith Declaration, but it seems like there was testimony early on, right, that you rely on, where is it Mr. Smith, or Dr. Smith, that said that this wasn't in the prior art? It is Dr. Smith that says this wasn't in the prior art. But it's true, is it not, that in this deposition that comes later on, he seeks to clarify and explain what his earlier comment was. In this declaration, Your Honor, which was submitted with Reel's reply brief on its second summary judgment motion, Dr. Smith is now opining for the first time that JavaScript and Java Atlas meet the programmatic control limitation. And he does that by, in paragraph 26, A5447, by saying that Frisket's patent disclosed other prior art methods for a server to send instructions and data to a client computer. So really, his truncated view now of programmatic control is that all it requires is instructions and data sent from a server to a client machine. Isn't that what one of your witnesses defined programmatic control as being? Professor Zellweger had, in discussing whether the infringing products meet this limitation, said that instructions and data, commands, are sent from the network server module to the media player in order to control media playback. That is much more specific than simply saying programmatic instructions such as JavaScript sent from a client machine to a, from a server to a client machine. I must tell you, I mean, that's one of the problems I have parsing through the entire record of evidence here, because you've got a series of depositions and statements made in the context infringement, of infringement, and then when invalidity becomes the issue, the party's views of what the claims say flips, and you've got people characterizing it in different ways. Am I wrong about that? Well, I would agree that it is a very convoluted record from that respect, Your Honor. But I would say that Frisket's position on the meaning of programmatic control has been consistent, and there is no flipping of views or viewing the claims one way for infringement and one way for invalidity. Would you say that one would characterize that as being direct control? Is programmatic, your definition of programmatic control really requiring direct control? The claim language is different, Your Honor, than the 275 patent, which requires direct control. But the context of the claim language in the 467 patent is that programmatic control is from network server module to the media playback component. So I would agree that it has to be directly from one, that the commands need to be directed from one to the others. And what's your answer in the Smith affidavit, the second one, or the second deposition that we were just referring to on 5450? He ultimately concludes that no matter what, even if it weren't explicitly in the prior art, he said that as is well known in the art, the client usually controlled the server. This is only one other, there's only one other option, the server controlling the client, and that's obvious. Why shouldn't we agree with that? I mean, that question would be a matter of law, a question of law, correct? And why is he wrong? That question would be a matter of law, I agree on whether it would find the claims obvious. But the claims do not require simply client controlling server or server controlling client. They describe a system in which a particular software module on the network side is sending commands directly to a particular software module on the client side to achieve a particular purpose. So I believe that his statement is an overgeneralization in terms of, well, either the client controls the server, the server controls the client, or a combination of both. It doesn't get at what the claim elements require here. If I may go on then, that the prior art, the disclosure of JavaScript and Java applets that Dr. Smith relies on here in his reply declaration. The evidence is that of an affidavit by Mr. Patterson. Restates the IUMA code would provide the plug-in, the URL of the Nexon, and would relay user input for controlling playback to the plug-in. The use of JavaScript in the prior art by the evidence in the record is to relay user input, is to allow the user to control the playback of the media resource. It is not as described in the patent where you have direct control, programmatic control from one module to the other module. You're into your rebuttal time, Mr. McG, would you like to save it? Unless anyone has any questions, I will reserve the rest. Very well, thank you. We will save the rest of your time. Mr. Verhoeven? May I please report? The KSR decision teaches that when a patent claims merely a combination of elements that are existing in the prior art, and that combination does not result in those elements having some unforeseeable function. In other words, they function in the same way as in the prior art. Then that patent is likely to be obvious. One of the difficulties here, as we noted earlier with your colleague, is that the record here is sort of a mishmash of people having taken arguably somewhat different positions at different stages of litigation. And isn't it problematic, therefore, when there's stuff in the record going each way, or at least with respect to inferences being drawn? So what is your response to the fact that given the conflicts in testimony, or at least the ambiguities in the testimony, that isn't enough to defeat at least summary judgment? Well, my response is, if we're talking about programmatic control, Your Honor, is that first and foremost, the reason that we don't have a crystal clear record is because the appellant, Frisket, asked the District Court to limit the number of claims to be construed to six each side. The District Court granted that request, and the appellant, Frisket, chose not to ask. No, I know, but what I'm talking about mainly is discussions and opinions as to what was in the prior art and what was not in the prior art. Well, I would submit the undisputed evidence was, and let me limit this to programmatic controls, as I think that's the main argument. Let me just say it this way. The appellant has made its bed and has to sleep in it. The appellant has taken the position below that programmatic control, the server programmatically controlling the client, means that the server sends instructions and data to the client. That is what the appellant said below. Now, the appellant should be required to live by that statement. The District Court adopted that understanding of programmatic control. Now, if you accept that as binding on the appellant, that this is what they've said programmatic control is, even though they didn't ask for construction, if you accept that as the meaning, the interpretation, the undisputed evidence of this case, Your Honors, shows that JavaScript is used in IUMA and is used in all kinds of different programs are programs that are sent from the server to the client to control. And I'd love to... Is there any evidence to show that JavaScript or anything else for that matter showed control from the server of a media player at the client? What the evidence shows, Your Honor, is that JavaScript, the user would click on a link and then the IUMA website, or you could take mp3.com and use a different program such as Java, use m3u, but we'll stick with Java. The IUMA website, for example, if you hit internet radio, the user clicked internet radio, the IUMA website would send down not just audio files, but scripts, JavaScript scripts or little programs. A person of ordinary skill in the art understands what script means. And the programs would tell the client, it comes through the browser, of course, everything comes through the browser of the internet. And then the browser reads those programs and exercises the instructions of those programs to manage the playing of one song to the next song. To manage a media player at the client's computer. Exactly. So the evidence should be put into evidence, the Winamp software program, there's all kinds of different media players, we just chose the Winamp. So the Winamp software program has both a media player that plays, and I believe this is on, it's got an illustration of a screenshot of this. Let's get it to it, Your Honor. This is the one that has the Amazon.com. Exactly, Your Honor. I'm blanking on the page here. It's page 56, I think, is this it? That's it, Your Honor. Thank you. So you can simply look at this screenshot, and it might be helpful in explaining this. This is what the user sees. And the bottom box here is a browser where the user could type in, for example, Bruce Springsteen. And then hit go. And then it comes back from, and it could be a number of different internet websites that were around prior to 2000, January 2000. IUMA was one of them. We'll bring back a list of links. The user would click on a link. One of the links that IUMA provided was something called internet radio. And if the user clicked the internet radio link, then the IUMA site, and the Patterson Declaration talks about this as well as other evidence of the record, Your Honor. The IUMA site, as well as their expert declaration, the IUMA site would then send both data, i.e. audio files, and JavaScript. The JavaScript is a program that would be delivered via web page. And the browser would read that as instructions and control the media player based on that. Well, I understand the HTML text and the URLs and all of that going back and forth. And my concern, though, is with respect to the notion of programmatic control and having control being affected on the server side. And in particular, in the context of the case before us, the testimony of your expert, Dr. Smith, is in appendix page 5024, where he says, the players that we've analyzed and evaluated, to my knowledge, cannot perform that. They cannot be programmatically controlled by a network server. Right. I believe you're citing to a deposition, Your Honor. And I think we need to put this in context, OK? This term was not asked to be construed. There's many different terms in the claims of the patent. This term was never focused on by the plaintiff at the district court level until after KSR came down. Prior to KSR, their alleged invention was simply integrating the different prior art things together in a single application. After KSR came down, all of a sudden, first time we found out about it was in their opposition to our summary judgment motion after KSR, when all of a sudden their invention is programmatic control. They complain about Mr. Smith not addressing that until the reply brief and the summary judgment motion. Well, the reason for that, and I'll answer your question, Your Honor. The reason for that is because it wasn't raised until the opposition. But to answer your question, Dr. Smith was, in answering that question, as he explained, was thinking of that term in the sense of a remote control, and not in the sense as the plaintiff, appellant, has interpreted programmatic control, both before the district court and on appeal. In a broader sense, I hear you, but he says what he says. He's saying, to his knowledge, they cannot, the players they've analyzed. And that included the WNAMP, and it included IUMA, and it included Java, and everything else, as I understand it, just cannot be controlled by a network server. So then we have the district court concluding on summary judgment, where all of the facts are to be read in a light most favorable to the non-movement. He concludes that real player plug-in software can bundle with Internet Explorer, could be controlled from web pages through Java and other technologies. And that's one of the bases for the ultimate conclusion of obviousness. So my question is, doesn't the record reflect at least a genuine issue of material fact that would undercut the conclusion of obviousness? And I would submit not, Your Honor. And the reason is this. When you, both for infringement and for validity, the process of this panel well knows it's a two-step process. And the first step in the process is claim construction. What does the term mean? And as Dr. Smith has explained in his declaration, that he was interpreting the meaning of the phrase programmatic control. Not factual issues, the meaning of that phrase, claim construction issues. Now, we find ourselves in an awkward situation here on appeal, because programmatic control is not the subject of a formal claims construction process. Why? Because the plaintiff appellant never asked for it. The plaintiff appellant limited it on their terms. Yeah, but be careful, counsel, how far you take that. Because that could backfire. If true, I mean, why shouldn't then we have to send it back to the district court for claim construction on programmatic control? We fully can decide programmatic control, therefore, what was really in the prior art under the right definition of programmatic control in order to assess obviousness. Because the plaintiff should not be able to tell the district court, I want to limit the number of claims to six terms to be interpreted. And then fail to identify. This was not a term that was agreed upon. So you tell us the rules of the game, that if one side doesn't ask for a particular claim to be construed, then they have to live with the construction they don't like in the process? I guess what I'm saying is a litigant should not be able to point to a claim term after urging the court to limit the constructions, not submitting it, then there's a change in the law. And they reinvent their case to say their invention is no longer integrationist programmatic control. And then they argue on appeal that it should have been construed. Well, the purpose of deciding this case, do you think we have to construe the term or not? I do not think so. And so what construction do we go? The plaintiff's construction, which is the server sends data and instructions to the client. That is in the record as the plaintiff's construction. And that's what the district court did. The district court adopted the plaintiff's instruction. And when we argued this motion before the district court, your honors, that's what I told the district court. I said, take their construction. We don't need to quibble over it. Take it. They say programmatic control means the server sends instructions and data to the client. They never before the district court argued in that summary judgment motion or prior to that, that it means anything narrower than that. Well, even if we accept that, I'm still struggling with the question on this record of whether the record reflects genuine issues of material fact underlying the conclusion of summary judgment. Let's just assume that we accept your interpretation of the claim language. Yes, your honor. Nonetheless, we have some statements of fact that seem to be contradicted by parts of the record. Now, I hear you that those parts of the record may have been generated in a somewhat different context at a different time.  Well, again, I would submit, your honor, if you're referring to Dr. Smith's testimony, he has clarified that he was interpreting the meaning of programmatic control to be different than what the appellant is saying. And he clarified, if you use the appellant's algorithmic language, if you use the appellant's definition, the programmatic control simply means the server sending instructions and data to the client, then that existed. And if we do exactly what you just said, your honor, let's take that definition, OK? And let's look at the specification. And you're referring to the clarification provided in his declaration. I was earlier, but I'm saying, if you take what he did. Let me make sure, because I have the same question as Judge Knight. The two pieces of evidence that you were talking about here, just to make sure we're on the same page. Yes, your honor. Is one, the deposition. And two, the declaration that was attached to the responsive brief on the second summary judgment motion, which is at 5449 to 5440. Yes, your honor. Yes, your honor. Gotcha. But if we could go back, your honor, to your suggestion. Let's just take that definition, OK? If we take that definition and say, look, you made this, you're bound by it. This is the definition. Now, let's look at the evidence. The evidence shows very clearly that JavaScript, as well as a number of other programs, existed to, and they have applets and scripts, widely, throughout the internet. They're used so that the server can send instructions to clients, to cause clients to do things. And in the actual patent, let me find this out, your honor. I'm citing to the 467 patent at column 11, lines 14 through 17. So column 11, lines 14 through 17, it says, and this is describing prior art JavaScript, says, quote, for example, the network server module may include applets or JavaScript delivered to the user terminal for execution of processes and functions as disclosed herein. And the patent itself refers to JavaScript, which is a very widely known program to those of skill in the art. Java applets, again, very widely known program to those of skill in the art. The patent itself says, look, you can do this, what we're describing here, controlling the media playback by using JavaScript. So the- But isn't that part of what they allege to be their inventive contribution? JavaScript wasn't even created by them, your honors. No, I don't think they're claiming that they invented JavaScript. But the use of network server control of the functionality of the media player on a client computer is what they've argued, it seems to me. And that's all this, isn't that all this is saying? Well, my response to that would be, whether or not using JavaScript, a program that's widely used by servers to control clients, for this particular application to control of an audio file from a server to a client, is that something that's obvious? It's a question of law. Council admitted it. Yes, it's obvious. Not only was it obvious, it was widely done for the delivery of audio files, as we've cited when we cited the IUMO evidence and the Winamp evidence. Just one more quick question. Just in the Gray brief, I think Frisket raised something which, obviously, you didn't have a chance to respond to in any subsequent brief. And they say their Java and Active10 controls were used locally to provide functionality in a browser to relay user input to the media player. Not to allow the network server to programmatically control the media player directly. And so, do you agree with Frisket that Java was limited to local use? I refer to that as their quote, unquote, user input argument. And apparently, what they're now saying is they're going all the way back to the beginning of the case when we said these patterns should be limited to automaticness. In other words, a user clicks, there's automatic playback. They fought that. They said, no, no, no, no, you still can manually click. And they won at the district court level. Now, apparently, in this reply brief, they're arguing that if there's any user input after the server sends the JavaScript down, that that means it's not being programmatically controlled. I strongly dispute that. And in fact, they just didn't. When you say dispute it, what do you mean? I mean that. You don't like the fact that they've changed positions? Or do you dispute which of the two positions are both? Both. But the that in that answer was that simply having the ability for a user to click on a link as part of the whole process here does not take you out of programmatic control. And you would say that is not a factual dispute, but rather because? Because they have said to the district court and on appeal that programmatic control means the server sends a sense of data and instructions to the client, period. Nothing more, nothing less. They did not exclude operating systems. They did not exclude that it might go to the browser. They did not exclude that a user clicking is part of the whole process. And so what they're doing, Your Honors, is they're pointing to and saying, well, an operating system's involved. Well, a browser's involved. Well, a user clicks at some point. But none of that has anything to do with what they have themselves defined programmatic control to be, which is simply the server sending instructions and data to the client. I'll conclude with real quick. Why do they do that? Because if they were to have adopted a narrower construction, perhaps the one that Dr. Smith was thinking of when he answered the deposition question, there would be no infringement. So I'll conclude with that, Your Honor. Thank you. Could you add four minutes to Mr. McGee's time? If you need it, Mr. McGee, you have a lot of time. Just a few points. First of all, counsel for real has said that it was Frisket's construction that all programmatic control requires is command sent from a server to a client machine. That is nowhere in the record. The portion of the deposition of Frisket's expert, Dr. Zellweger, that real seizes on doesn't say that. It doesn't say that programmatic control is just sending controls from a server to a client. And that's quoted on page 36 of our blueprint. And on the issue of whether we have waived our arguments here by failing below to request a construction of programmatic control. As we discussed in our briefs, there was no dispute on the parties that made it relevant until that last summary judgment, post-KSR summary judgment briefing. And at the hearing, counsel for real told the district court at A100673 that there's some issue as to what programmatic control means. And it is at that point that real set out their view that somehow Frisket had taken a position that's really sending instructions from the server to the client. And at that hearing, Frisket was very clear in terms of what its view of programmatic control has consistently been. And that's at A100690 and 691. Now in terms of the prior art, what the prior art does not show. To save us looking up, what exactly was your position at that point? 690. That is your point at which you, well, we don't seem to have 690. 1006 in the volume. 1006, I'm sorry. 690, 100690, volume four. Yeah. Now, we're looking at 691. Where in 691 do you state? If I may, first on page 690. Yeah. Line six through seven, programmatic control by a network server to control the media playback component. It has to be directed to the media playback component. And on 100691, counsel for Frisket below says that the claim language requires the network server module at lines 15 through 18. Network server module programmatically controls the media playback component. And as figure five in the specification described, it is the commands and the URL sent from the network server to the media playback component, the API of the media playback component. In the prior hours, the network server module couldn't send that URL directly to the media playback component. It had to go, it had to appear to the user in a web page in the browser where the user first clicked on it. But by in the indirect form, wouldn't it be still correct to say that the network server is controlling, ultimately, the media playback component? Your Honor, in the disclosures in the record regarding the use of JavaScript in the prior art, this is explicit in Patterson's declaration. The role of the JavaScript is not to control the media playback. And first of all, we don't have the JavaScript available to us in the record. The district court didn't have it to see what functions that JavaScript performs when it's executed. But by Patterson's own statement, it is to relay user input, to relay user input. And it doesn't say for what purpose or to whom it's directed. It is to relay user input within the browser-controlled window. And so from the meager description, the two paragraphs in Patterson's declaration on JavaScript, the one paragraph in DeRose's declaration regarding artist radio, which Dr. Smith relies on, which doesn't even mention JavaScript, that's the best we can determine. That reference wasn't even in front of the court. I think, can I, one quick thing, and that's that I think you started off by disputing the question of what Dr. Zellweger said or didn't say with respect to the definition of programmatic control. Yes. I mean, the district court says in its decision, as Dr. Zellweger explained in her deposition, programmatic control requires that the network server module must send both instruction and data to the media playback component, not just that. Is that wrong? Is that what she said in her deposition? I mean, is that a correct quote? That's a quote from the district court's opinion. He was quoting her deposition. The quote from the deposition is on page A5015, and it is the network server module has specified the instruction plus the data that then goes to the media playback component, and the media playback component begins playing back those tracks. In the district court's order, it's page A9 in the middle paragraph there, lines 5 through 16. What the district court seems to adopt is the view taken by Reel here, that it's merely the JavaScript sent from the network to the client. There seems to be a disconnect between those two portions of the district court's order in terms of what the district court said, Dr. Zellweger said, and what the district court applied to find this element in the prior article. Unless the court has any further questions. Thank you. We thank both counsel. The case is submitted, and we will be expecting a letter then